We're here in clause number 22-7001, Richard Lee Taylor v. Bobby Lumpkin. I should explain that Judge Englehart is participating in oral argument via telephone. He is already on the line. Judge Englehart, are you there? Yeah. He's here. He can hear us. And if the appellant is ready to proceed, then we will begin. Good afternoon, Your Honors. My name is Claudia Van Wyk. I represent Richard Tabler. And I see from the clock that the five minutes I requested for rebuttal has been reserved. I'd like to, the Court has a number of claims in front of it. I'd like to focus on two areas this afternoon. And of course, I'll answer questions on any other areas. The two areas are the reasons Mr. Tabler was not at fault for any failure to develop the evidence on his ineffectiveness of trial counsel claim in state court, and therefore no obstacle exists for federal evidentiary development under 2254E2, and especially because of trial counsel's, state habeas counsel's abandonment at the state waiver hearing. The second area I'd like to focus on is the reasons the case requires a remand for fact development on a number of issues, assuming the Court moves in Mr. Tabler's favor on the evidentiary development issue. So on the matter of abandonment, state habeas counsel refused to participate as an advocate and effectively left Mr. Tabler without counsel at the competency hearing that took place in state habeas court. He announced that he was present but not ready because he was not going to take a position on waiver. He made no objection when the Court incorrectly advised Mr. Tabler on the deadline to waive four times on the record at least, essentially left him to deal with the Court alone, didn't point out that the two-page competency letter that was admitted as a court exhibit asked the wrong referral question and was not very informative about Mr. Tabler's understanding of his options in habeas because at the time the expert talked to him, Mr. Tabler was on board with his appeals. Counsel asked to be released from responsibility for further representation at the end of the hearing. The Court entered such an order a few weeks later, and so by the time the deadline to waive arrived, counsel had been released, had had no contact with Mr. Tabler, and he was formally unrepresented just as he had been effectively unrepresented at the hearing. Even though counsel was present, he refused to advocate one way or the other. And among the grounds for finding abandonment is the fact that there was a 17-page letter written by the same expert who had done the two-page competency report, that's Dr. Harrison. Dr. Harrison described Mr. Tabler as suffering from a deep and severe constellation of mental illnesses, rated him as having a global assessment of functioning of 15 out of 100, said he had a severe bipolar disorder with psychotic features, borderline personality disorder, had engaged in self-mutilation, had serial traumatic brain injuries, and counsel didn't reveal the existence of this letter to the Court, which would have given the Court information I would submit it needed in order to decide whether Mr. Tabler was able to rationally understand his position and, more importantly, make a rational choice among options, and whether Mr. Tabler suffered from any mental disease or defect. Yes, Your Honor. Did the letter opine on whether he would be competent to waive his state habeas? The two-page letter said he was competent to waive automatic appeal and said that his understanding weakened when talk turned to other avenues that might be available. That was the two-page letter. The other letter had been written separate from the question of competency, but it had a wealth of information that would have been highly relevant to whether Mr. Tabler could make a rational choice among options. Was it written, I don't recall, was it written after the two-page letter or before? They both stem from the same examination. I believe the 17-page neuropsych report was written about a month before the competency evaluation. I think the 17-page report was written in July, not forwarded until September, and the competency evaluation was written, I believe, in August. Is it fair to say the 17-page letter just didn't address competency? That's right. Okay. But it had a lot of information that I think should have been explored before the Court decided that this was a knowing, intelligent, and voluntary as well as competent waiver. And I think this case can compare favorably to another panel's recent decision in Mullis v. Lumpkin. In 2022, this Court decided Mr. Mullis's application for a certificate of appealability and granted COA on some issues, but not on an abandonment issue that was very similar to this one. And the Court held that counsel did not abandon Mr. Mullis because counsel knew the correct deadline to waive, sought to have it extended, asked the Court not to rule on whether or not he should waive until the deadline arrived, continued investigating, had a second psych eval done, and when the Court's expert came back with a 20-page report specifically focused on competency in contrast to a two-page report here, Mr. Mullis's counsel called the expert and tried to ask him questions to see if that could be ameliorated. Here, counsel did not correct the misstatements about the deadline, didn't seem to know the deadline, asked to be relieved before the deadline had even arrived, certainly didn't ask for more time, which the Court had discretion to grant. That Court could have granted another 90 days. Didn't tell the judge about the 17-page report and didn't investigate. You're saying all this with respect to an abandonment argument, right? Yes, Your Honor. I take it that it's not enough, it would not be enough for us to find that these were errors or lapses in judgment by counsel, but that they rose to the level of abandonment. That's right. Counsel was there but did nothing and actually announced that he would do nothing. He was not going to advocate one way or the other. He was not going to take a position. Did he say why? Did he say why? He did not say why to the Court. No. No, Your Honor. Was that after Mr. Tabler had sort of announced his decision that he didn't want to, he wanted to waive further habeas? That was the first thing that happened in the courtroom that day. Counsel said, I'm announcing that I'm present but not ready because we are not going to take a position. And he had apparently made that known to the Court and Chambers previously, but the Court had not begun questioning Mr. Tabler. Counsel stands down and, I'm sorry, Your Honor, I didn't mean to. Because we are not going to take a position? Excuse me? You said he said, I'm not advocating because we are not going to take a position. He had, yeah, he had two lawyers. Mr. Tabler had two lawyers representing him. One of them took the main role. The other one didn't speak much, but they were both appointed to represent him. And I should point out that in Martinez v. Ryan, the Supreme Court recognized two different situations where a problem with state post-conviction counsel can constitute cause and prejudice. One would be where a litigant is completely without counsel, and the other is when the litigant receives inadequate or ineffective counsel. Ramirez talked about a subset of the second category, ineffective counsel, and Ramirez really focused on negligence, didn't say anything about the situation where there's no counsel at all. And I think, in effect, although counsel was standing there, Mr. Tabler was essentially unrepresented. The most of the colloquy after this opening interchange where counsel tells the judge he's not going to take a position, most of the colloquy was directly between Mr. Tabler and the Court. Had Mr. Tabler expressed a desire to represent himself? No. He had not. He never asked. And that is an important distinction between Mullis and another case, Green v. Lumpkin, which is another recent decision. Mr. Tabler never said he wanted to represent himself. And the law of agency, of course, was the prime principle behind the Supreme Court's decision in Shin v. Ramirez and talks about whether the agent is acting or failing to be a client's agent in any meaningful sense. And I think that standard was just not satisfied here. Counsel didn't object to misstatements of law, didn't tell the Court about the existence even of this lengthy report, didn't act in his client's best interest, and asked the Court to relieve him of further responsibility in the case. And I think that sent — Now — I'm sorry, Your Honor. I'm sorry. Mr. Tabler, he seemed to go back and forth about whether he wanted to actually do Stadhevius or not. In the run-up to this, yes, indeed. Yes. And then — and so at this hearing, he's saying, I don't want Stadhevius anymore, I want to waive it. That's right. He changed his mind later, right? He does. And at that point, did the lawyer step back in to assist him? The lawyer filed a motion to set a new date under Section 4A of 11-071, did not make the best argument that could have been made, and this is very similar to Maples v. Thomas. The best argument to reinstate the Stadhevius proceedings would have been for the lawyer or unconflicted counsel to say that the lawyer had mistakenly given Mr. Tabler the impression that the deadline was much later than it in fact was, and had not advocated at the hearing that he should not be permitted to waive. Instead, the lawyer filed a very pro forma motion saying that Mr. Tabler doesn't exercise good judgment, didn't say he was incompetent, and just a very, very one or two-sentence explanation of why the Court of Criminal Appeals should reinstate. The case law that we've cited in our brief makes clear that there was a very good chance that unconflicted counsel could have secured a new opportunity for Mr. Tabler at that point. There are cases where . . . What do you mean, unconflicted counsel? Well, Mr. . . . his State-appointed counsel would have been conflicted from coming to the Court of Criminal Appeals and saying, we messed up. It was our error. We never told him that the deadline was almost upon him. He had this idea that the deadline was after the State Court of Criminal Appeals had ruled on his direct appeal, and that's confirmed by what the judge said to him on the record, what counsel told him, and what Mr. Tabler said about his understanding. He said over and over, I want to waive my appeals after my direct appeal. And what the court said to him was, after the direct appeal, you may proceed with your State habeas proceeding, and what do you want to do then, when, in fact, under State law, the time was going to run out imminently, within 45 days of when the State filed its brief, which happened the very next day. No one explained that to Mr. Tabler, and he asked to resume his State habeas litigation within the time he had been incorrectly led to believe, you know, before the deadline arrived. He had incorrectly been led to believe that the deadline to file would not arrive until after the State Court of Criminal Appeals decided his direct appeal, and months before that, about six months before that, he asked to reinstate. Just to put this in larger context. Yes. What you're talking about here is an error, or you say abandonment, by State habeas counsel that would excuse the failure to raise claims on State habeas, such that they would not be procedurally defaulted. Well, I'm talking about it in two contexts. I'm talking about the abandonment in the context of whether federal fact development is available under 2254E2, and because Shinbi Ramirez rests on principles of agency, severing of the agency relationship would take this case out of that limitation. It also, however, is one of several reasons that State habeas counsel was deficient within the meaning of Martinez v. Ryan. Would we also, let's say we found that State habeas counsel made mistakes, didn't provide adequate representation, would we have to find that that would make a difference as to whether, in other words, would we have to find that the trial court would not have found him competent to waive State habeas if State habeas counsel had acted appropriately? You would have to use the Strickland standard under Martinez. That's the prejudice part of the Strickland? Yes. Okay. Yes, Your Honor. Okay. And of course— And we'd also have to find that the claims that he would have raised on State habeas are substantial? Yes, Your Honor. Okay. And there are several of those. Which ones do you say are substantial claims? Number one, trial counsel failed to conduct a minimally adequate investigation of Mr. Tabler's background and his mental health. Counsel had multiple red flags of serious problems. They had an EEG that they had conducted that was abnormal. They had neuropsych testing that they had performed, which was abnormal. I'm sorry, Your Honor. I'm talking about State habeas counsel. Yes. Trial counsel. Yes. State habeas counsel, if he was in fact, if they were in fact ineffective. Right. You would also have to show that the IATC claim. Yes. The trial counsel claim. And I understood that had to do with the failure to—or the failure to object was to victim impact? That's another—that's one of the issues, yes. So trial counsel did have an EEG performed, and they did have neuropsych testing done, which was abnormal. They had a report that his mother drank while she was pregnant. They knew that he had received mental health treatment when he was a teenager. They knew his school performance was abysmal. So they had plenty of reason that should have prompted them to conduct a thorough investigation. The extent of their investigation was phone calls to his mother, his father, and his sister by the original trial counsel, who was relieved shortly after appointment, and again by one of the experts, and then the mitigation specialist had one joint visit with the mother and sister in person. And that was the extent of the background. That's failure to investigate mitigating evidence for— That's right. That's right. Tell me, did Judge Pittman address this prejudice, this substantiality of the underlying claims, right? Well, he addressed it in the alternative. He addressed it under a factual misconception that I think was clearly erroneous. In his view, we had failed to support the social history that we provided with a single affidavit, and therefore he viewed our factual allegations as speculation and hearsay, and he was mistaken. We had submitted an appendix containing 18 declarations from background witnesses and five expert reports. I understand your argument. Yes. I guess my point was that we're reviewing that for clear error, right? That's right. And the standard for clear error is whether the finding appears to be plausible in light of the record as a whole, and it was beyond implausible. It was—that finding was squarely contradicted by the record, as was the finding that the experts never indicated that they were available to testify. As was the finding that trial counsel had the assistance of—I'm sorry, this is state habeas counsel— had the assistance of two mitigation specialists. The first one, trial counsel approached, turned him down because it was the same person who had done the trial, and the second one never talked to a single witness. So that was also mistaken. And I should point out that Andrus v. Texas, the Supreme Court, found that trial counsel there had conducted a deficient investigation, even though counsel had presented the defendant's mother and father, a mental health expert, and a prison counselor. And we also could show, given a hearing, that there was prejudice. We could have shown—we could show that Mr. Tabler has undiagnosed Kleintelter syndrome, which is an extra X chromosome which has many symptoms, including overwhelming anxiety, that he also suffers from a fetal alcohol spectrum disorder. The trial neuropsychologist, Dr. Millam, said that this neurological difference was a medical problem and not a moral or willpower failing, and had she known about it at the time of trial, it would have put the case into what she called a completely different context and would have had a significant impact on her interpretation of the results. The undeveloped mitigation includes a large number of disinterested witnesses who could have described the mother's abuse of alcohol, the fact that both parents were abusive, Mr. Tabler's developmental delays, multiple suicide attempts, specific examples of incidents like uncontrollable tantrums that lasted well into his school years. He's eight, nine years old, and he's down on the floor screaming like a two-year-old. I understand your argument. We're still talking about the failure to introduce mitigating evidence at the possible phase. Yes. Just to refresh my recollection, I know a COA was granted on certain issues in this case. Was a COA granted on this particular IATC claim? No. Okay, so COA was granted on victim impact. That's right. Okay, I see. Did you want to argue about the victim impact? Yes, sure. If you'll bear with me a moment. The state has agreed and the district court below also agreed that evidence that was introduced at the trial concerning the impact and good character of two victims who were not charged in the indictment was clearly inadmissible under Texas law. There's a case called Cantu v. State. The state refers to various opinions since then which have refined the rule in Cantu and made clear that if some other issue comes up, like what we used to call the res geste, or there's some other evidence concerning the facts of the crime that implicate injuries to the victim, the non-charged victim, that would be admissible. But here we have the very forbidden topics. The two witnesses talked about the young women's good character, their love of life, and the devastation that their families felt. And that evidence could not be more heartbreaking and more compelling to have two grieving relatives talk about the death of their children under such circumstances. And I think that there's a reasonable probability if that had been introduced, that alone would have been enough to change the outcome. And the court should also consider this error cumulatively with the other issues that we detail in our Certificate of Appealability, assuming that the court decides to grant COA on some of those. I see that some of my time is almost up, and I'd like to reserve the rest of my time. Oh, I'm sorry. I'm not presiding. Unless the court has questions on any other matters. Thank you, counsel. May it please the court. There's no dispute here that Tobler procedurally defaulted his opportunity to seek relief in state habeas. The state court found that he was mentally competent to do so, and that finding is entitled to the presumption of correctness under 2254E2. He would need clear and convincing evidence to overcome that fact-finding, and he doesn't have that here. There's no dispute that his claims are procedurally defaulted. So the first way to back up and make sense of this case is to figure out what exactly are Tobler's theories for overcoming that procedural default. His briefing sketches an outline of essentially three different theories. Two of them, he contends, would get him around E2 and Shin v. Ramirez, and so that's the focus that my friend on the other side has made today. The third is Martinez-Trevino, which, of course, Shin v. Ramirez made clear last year is subject to E2. So hence the focus on the abandonment theory under Maples v. Thomas. That abandonment argument falls within two different lines of cases as articulated in the briefs. One of them is Maples v. Thomas. The other is Holland v. Florida, and Holland v. Florida is the basis for Tobler's argument that this extraordinarily deficient performance is different and outside of Martinez-Trevino. Now, both the Maples theory and the Holland v. Florida theory fail, the first on the facts and the second on the law. And then, of course, there's Martinez-Trevino. So I'd like to walk through these three different theories for cause and prejudice and, of course, welcome the Court's questions on any other issues in the case. We can start with Maples v. Thomas. This fails on the facts because Maples v. Thomas requires not just abandonment by state habeas counsel, it also requires that that abandonment have been without notice to the petitioner. So even if we assume that the errors that Tobler lays out here constitute abandonment, though we disagree with that, there's no question here that Tobler had notice of how his counsel was addressing this issue. Tobler was aware. You can look at ROA 1329. That's a letter from counsel to Tobler, and that letter provides the answer to why. Judge Graves asked, did counsel explain why he wasn't going to take a position? That answer is in ROA 1329. The letter says, I do not believe it's my job to prevent you from waiving, but I also do not believe it is my job to help you do it. Then the letter goes on to explain that counsel, in reliance on Dr. Harrison's report, believes his client to be competent, and so he's not going to stand in the way of his client's decision to waive. He told his client, if the judge asks whether I think you're competent to make this decision, I will tell her that you are, but that will be the extent of my involvement. So Tobler knew exactly what was going to happen going into the hearing, and that's what happened. As we discussed in the opening argument, counsel told the court that he was not going to advocate one way or the other, and that was a reasonable choice for counsel to make. When counsel doesn't actually believe that his client is incompetent, he does not have a duty to contest competency as sort of a matter of advocacy. As a faithful agent, counsel should not go against his client's decision. Whether or not to waive state habeas is a decision that's for the client to make, not the lawyer. And so it was Mr. Tobler's choice whether or not to waive habeas or not. Then, of course, Tobler also was present at the hearing, so he had notice of what was going to happen, and then he had notice that his counsel had been discharged and put on standby. So he knew that he was pro se at the time of the waiver deadline. Now, that deadline came up on November the 17th, and Tobler at that point was pro se. As my friend puts it, he was unrepresented at that point. And we agree with that. He was unrepresented after the hearing because the state court had dismissed counsel. That means that regardless of what happened previously, E-2 applies, because we're no longer talking about a principal-agent relationship and whether or not the agent's errors are attributable to the client. Once the defendant is pro se, we're talking about his own errors. That means that E-2 applies on this case either way. Now, of course, just to step back, we don't think that counsel abandoned Mr. Tobler at the hearing, as I've discussed. He acted as a faithful agent. The way he chose to handle this hearing was well within the wide range of reasonable professional assistance. That's Harrington v. Richter discussing the Strickland standard. So the Maples argument should be put to the side. Now, the extraordinarily deficient performance argument is Tobler's second attempt to get around E-2. He explains in his reply brief that that's in reliance on Holland v. Florida. The problem with that is Holland v. Florida is an EDPA equitable tolling case, not a procedural default case. It's about what happens when federal habeas counsel misses the EDPA filing deadline. And, in fact, Holland v. Florida was the precursor to Maples v. Thomas. It set the stage for Maples v. Thomas. And in Maples, Justice Ginsburg for the court adopts the agency rationale from Holland v. Florida over to the procedural default circumstance. You don't get to use Holland v. Florida instead of Maples v. Thomas if we're dealing with a procedurally defaulted claim. I mean, just to put a little bit of flesh on these bones, I mean, Maples, as I recall, is about lawyers in a big firm who are representing somebody. I guess on habeas, I don't remember when, but they left the firm and they didn't tell him about it. So it's easy to understand abandonment there because it was abandoned. Correct. I understand the argument for why, but the facts help characterize that case. Yes, that's absolutely right. Maples v. Thomas is about the lawyers leaving the firm. Nobody gives a forwarding address. No other lawyer appears, and so the firm doesn't get notice that the state habeas decision, the initial decision was made. Everything goes south from there. So that's a true abandonment case. But importantly, Justice Ginsburg also focused on the lack of notice to the petitioner. It matters in that case that the petitioner was unaware that the lawyers who had filed the briefs and had represented him had left the firm. He was reasonably relying on his lawyers to be continuing as his agents. We don't have that here because Tabler knew exactly how his counsel was going to handle the hearing. Do you want to address the 17-page letter, I think by the same expert, and the arguments with respect to that? Certainly. Yes, so that letter comes in, whether you think about this as abandonment or deficient performance for purposes of Martinez-Trevino, as I understand it, the argument is that state habeas counsel sort of introduced this letter as part of advocating that the client was incompetent. That was not deficient performance, and there are a number of reasons for that. First, as I've already mentioned, counsel doesn't have a duty to create a competence issue if counsel doesn't actually believe the client is incompetent. Second, this court has recognized in a number of cases that counsel can rely on mental health experts' assessments. That's what happened here. In fact, this case is easier than Mullis because in that case, counsel actually contemporaneously had some concerns about a court-appointed experts' competence finding. Here we don't have that. Defense counsel or habeas counsel obtained funding and got an independent expert who was part of the defense team, and so this seventeen-page report was privileged. That's something that they couldn't have done if they had relied on the court-appointed expert. It was done in Mullis. There's no evidence in the record that counsel doubted the reliability or the usefulness of the expert's assessment that Tabler was competent. Turning to the substance of the additional privileged report, there are a number of reasons why that doesn't change things. As we discussed in our brief, the report includes a number of pretty prejudicial things that Tabler discussed with the examiner that counsel could quite reasonably decide should not be aired in a public setting. On top of that, the actual mental health diagnoses that are discussed in that report are things that were already put in at trial, and this state habeas court was also the trial judge. So the trial judge had tried the case for five weeks. She was well aware that there were diagnoses of bipolar disorder, borderline personality disorder, and perhaps the most problematic thing from counsel's perspective about putting this lengthy report into evidence is that it agrees with the trial expert's assessment of antisocial personality disorder. That was put on a trial by the prosecution, and trial counsel did their level best to clean it up, but that was something that the defense team did not want to come in. So if their own expert opines that this defendant has antisocial personality disorder, if he does decide to pursue state habeas, if he changes his mind, then it would be very prejudicial to have this report in the record. Instead, they kept that privileged, and that was well within the bounds of reasonable professional assistance. Also, because the evidence that's discussed in it is all duplicative of evidence that was before the trial court, you can't show strickling prejudice on that basis either. The simplest way, I think, to deal with this report is to recognize that trial counsel and state habeas counsel here did not actually believe his client was incompetent. Zealous counsel now, of course, has come up with arguments that he was incompetent, but there's no evidence that contemporaneously anybody doubted the expert assessment. And that makes sense, because competence is a fairly low bar. For purposes of trial, we all learn in law school the basic standard for competence. You just have to have a rational and factual understanding of what's happening, sufficient to assist the defense. That's basically the standard that is adopted for waivers of state habeas as well or decisions against the advice of counsel later on in proceedings. And so we can think of it as this, this rational and factual understanding, just the ability to know what's going on. Nothing in Dr. Harrison's report or in any of the other evidence that's been put forward in federal habeas shows that this petitioner was psychotic, that he was hearing voices, that there was something that was preventing him from understanding. All of the arguments instead go to that he's just bad at making decisions. But that's not incompetence. So I can understand the train of thought here. By talking about this, does this go both to whether state habeas counsel performed deficiently and also to the prejudice part, which is assume they did, what difference would it have made to the trial court's competency finding? Yes, absolutely, Your Honor. Even if state habeas counsel had argued, started with that hearing and argued his client was incompetent, there is no showing on this record that the state habeas court would have agreed with that and found this defendant incompetent. Even with all the evidence that's now in front of the court, there's no incompetence showing. And particularly if we limit it to the evidence that was in existence at the time, which is primarily Dr. Harrison's privileged report. And so the whole point of this, I'm sorry, I'm just having to keep track of the flow chart in my mind. The whole point of this is to figure out whether there was cause for the default Absolutely. during state habeas of the underlying, well, the only one we've granted a COA on, as I understand it, is ineffective assistance of trial counsel with respect to victim impact testimony. Yes, that's absolutely right, Your Honor. That's how we think about it too. And so we'll turn then to the third theory for cause and prejudice, Martinez-Trevino, because that's a pretty good segue. Martinez-Trevino, of course, allows a showing of cause and prejudice based on ineffective assistance of state habeas counsel. But the ultimate question is still cause and prejudice. And Tabler hasn't drawn any causal connection between the alleged attorney ineffectiveness he argues here that he has a COA on, the failure to argue competence, and the underlying IATC claim. He doesn't argue that counsel was planning to raise that claim, and more importantly than that, he doesn't argue that any competent constitutionally adequate state habeas lawyer would have raised this claim. The claim on which he has a COA turns out to be kind of an afterthought. Nobody really thinks that this victim impact claim is something that habeas counsel absolutely would have raised. So without that causal connection, I would urge the court not to even get into Martinez-Trevino, because we're still talking about cause and prejudice here, and so we still need to make that connection, and that's missing on these facts, even if you accept all of the arguments that Tabler raises here. What do you think? In that view of things, at one point I wanted to ask you about our court's recent decision. You mentioned Mullis. It seems like there's more than one Mullis, but the most recent one is June 19th, Judge Smith's decision in Mullis. And at some point, again, I'm not sure where it fits into the argument. If you could comment on what impact, if any, that has on this case. Absolutely. I'm happy to talk about that right now briefly. So the Mullis decision has two components to it. One is a procedural decision, and one is the underlying analysis of the cause and prejudice claim. What I mentioned before was that second part, the cause and prejudice. The first part of it, which could also impact this case, is it's holding that based on the rule of orderliness, the court can consider new federal evidence for purposes of deciding cause and prejudice, even though E2 bars it for considering the underlying IATC claim. I thought that's what we heard. So that means that things like the correspondence between state habeas counsel and Tabler that were put into the record for the first time during the federal proceedings, Mullis says those can be considered for purposes of cause and prejudice. Did Judge Pittman consider that evidence? Yes. He did. Judge Pittman did consider all of the evidence. So his decision is... So that kind of takes away the argument to the extent that you're making it, well, that shouldn't have been considered, at least for purposes of right now. It can be considered, and he did. Yes. Yes, as it stands today, the court's precedent under the rule of orderliness says that it can and should be considered. So we've taken it into account, and on the question on which Tabler has a COA, that evidence undermines his claim. ROA 1329 comes into that category of evidence. All right. I mean, I think I'm interpreting your answer as, yes, it could factor into the analysis of this claim, but it wouldn't make any you're not saying it would make any difference. Correct. I don't... The new federal evidence doesn't change the result on cause and prejudice. And the new federal evidence cannot be considered when it comes to underlying IATC claims. So, yes, Shinvi Ramirez says that E2 bars its consideration. So all of this new evidence about Klinefelter syndrome can't be considered for an underlying Wiggins claim. That means that there's no call for expanding the COA, that a claim that's based on evidence that can't be considered does not deserve encouragement to proceed further. So to wrap up that Martinez-Trevino analysis, even if you assume that attorney ineffectiveness like this that doesn't have a causal connection to the underlying claim could suffice, Tabler hasn't shown attorney ineffectiveness here. As we've already discussed, counsel did not have a duty to contest competence. And as to his request to expand the COA to additional alleged incompetence, none of those deserve encouragement to proceed further either. The state law that Tabler cites says that if a client wants to waive, counsel either has to withdraw or continue to research the claims anyway. Counsel chose door number one and was dismissed. So there's no ineffectiveness there. And again, Tabler knew that his counsel had been dismissed and that he was going to be appearing pro se. As to expanding the COA, there was a lot of discussion about the habeas deadline and the idea that Tabler would have made a different decision if he had known that the deadline was coming up. That claim does not bear out on the record. If the court looks at the record cites that are cited here, it is state habeas counsel trying a line of argument that trying to get the client to agree to let them file a habeas petition because he was not going to be executed any sooner either way. So if you look at, for example, ROA 1307-08 and 1210, those are the primary citations that we have here from the petitioner. If you actually read the entire letter, it's not counsel misstating the deadline. It's counsel trying to get the petitioner to wait on waiver, let them continue working on the case, and if he loses on direct appeal, then he can go ahead and waive his state habeas proceedings, meaning withdraw his petition. There's another letter that Tabler doesn't cite, ROA 1295, that makes this even more clear. He explains that by the time the direct appeal is decided, we will have long ago filed your habeas petition. More than that, if Tabler was really confused here, there's no reason he couldn't put in evidence of that. So there's no prejudice based on that theory either because there's no showing that Tabler actually was confused or, importantly, that he would have made a different decision if he had known the true deadline, which was coming up in November of 08. I will finish up by just briefly talking through the IATC claim on which the district court granted a COA. That is the victim impact theory. That claim fails whether you consider it de novo or for substantiality. Trial counsel's decisions about how to question witnesses, how to proffer objections is entitled to substantial deference, and here it was perfectly reasonable for trial counsel to handle this as trial counsel did. Importantly... Counsel, this is Judge Engelhardt. Can you hear me? Yes. One question regarding the victim impact statement. As I understand it, Mr. Tabler had been charged originally for the two murders, and those were dismissed. Is that correct? No, Your Honor. Well, they ultimately were dismissed, but he was charged with those murders as well, and they were not dismissed until after his conviction. Okay, okay. And so my question is, was there any discussion between the prosecutor and defense counsel about that being sort of a, for lack of a better term, I hate to use the term plea deal, or some type of evidentiary agreement in connection with the dismissal vis-a-vis the admission of that into evidence at the sentencing phase? There's no evidence of that in the record one way or the other, Your Honor. Okay, okay. So Tabler hasn't made any kind of showing about what trial counsel's agreement is. So we have to presume that his trial counsel was acting within reasonable professional bounds. Here, again, we are not, the victim impact objection, which, to be clear, we do not concede would have been successful, but in any event, even if it were an objection that counsel could have raised, it doesn't go to the entirety of this grieving mother and grandmother's testimony. There's no argument raised here that the state wasn't entitled to put them on the stand at all. Instead, this is an argument about a few of the lines of their testimony. And so at that point, we're not talking about a motion in limine or something that trial counsel could have done prior to them taking the stand that would have kept them off the stand as a whole. It would have to be an objection when the prosecutor elicited testimony that trial counsel might not have thought was objectionable as victim impact or victim character. Counsel could reasonably decide, even if he thought that objection was something that was available, counsel could reasonably decide not to draw attention to the testimony by raising it and not to risk alienating the jury by objecting and cutting off these grieving women talking about their lost children. Absolutely, it was significant testimony, but the objection goes to whether they testified at all, not to these particular lines in the testimony. And then if you take a step back and look at the entire case, while the testimony could have been significant, it was not going to be the deciding factor in the jury's decision whether to find mitigation or not. Again, this testimony doesn't say anything about all of the aggravating evidence that was in the record, the numerous threats to law enforcement, other people, Tobler's successful escapes from law enforcement in California and his responses with threats to them. It also doesn't go to the premeditated murders that we're talking about here, both the ones he was convicted of and the two women whose deaths are at issue in this underlying IATC claim. It was not going to make a difference. Correct me if I'm wrong, the district court found that assuming an error in admitting the victim impact testimony was harmless? Correct. What do we review that for? Well, the district court, it's still a de novo legal question, but the district court was correct in making that assessment, particularly when we had taken into account that for purposes of IATC claims you can't take in all of the additional mental health and background evidence that was proffered for the first time in federal habeas court. Now, we don't think that that would have made a difference either, and neither did Judge Pittman, but especially if that's off the table, which it is, then this purely record-based claim would not have been prejudicial to the petitioner. I'll yield the rest of my time unless there are further questions. Thank you, counsel. Rebuttal. Judge Duncan asked about the Mullis case. I'd like to begin briefly talking about the differences between the June 23 decision and this matter. The only question in front of the court in Mullis was whether counsel was at face value. That report was very different from the two-page one at issue here. It was 20 pages long. The expert had access to a fair number of records, and the court held that counsel had reasonably accepted the conclusion of the mental health expert because the expert did know what the court called the contours of Mr. Mullis' mental health history. Here, counsel didn't make any effort to attack the two-page letter, which really was not very informative, didn't tell the court about the existence of the 17-page letter, didn't know about the deadline for waiver, and gave inaccurate advice. And so in all those ways, it's a very different case from Mullis. Judge Englehart just wanted to know whether there was any discussion between the prosecutor and the defense about possibly negotiating or dealing with all four of the charges in one. What I can tell the court on the record during the pretrial hearing on the motion to suppress Mr. Tabler's statements, the statements were redacted to remove references to the murders of the young women for the guilt phase, and at that point it was known by the defense that the state was going to introduce evidence about those murders at the penalty phase. So defense had ample notice that they were going to be facing this at penalty phase. It was not necessary for the defense to jump up in the middle of testimony. They could have made some efforts before the testimony began, and I disagree with my adversary's characterization of that testimony. I think it's nothing but squarely within the heartland of the Cantu decision. Both of the women talk about the hard lives of these two young girls who came under their care because of very, very sad circumstances, and then talked about their character for resilience and joy, and then about how devastating it was to lose them, and I think that is exactly the kind of evidence that's forbidden. The state argued that the competency determination was entitled to the presumption of correctness, and one of the areas that we could address on evidentiary hearing would be to rebut that by clearing convincing evidence, because not only could we introduce Dr. Harrison's 17-page statement, but Dr. Dudley, who testified at the 2018 hearing, talked about Mr. Tabler's substantially impaired ability to make voluntary decisions that are not compromised by his disorders. He talked about his overwhelming anxiety and overwhelming mood instability that become the driving force behind decisions. There's a Dr. Curry who talked about temporal discounting at the same hearing in 2018. He said there's almost no future benefit that Mr. Tabler won't trade off for immediate relief from the biologically based overwhelming anxiety and mood instability that he suffers from. And Dr. Novick-Brown, whose report we presented, talked about how his lack of executive functioning is also biologically impaired. These are not minor character disorders. These are medical problems that have had a cataclysmic effect on his development throughout his life, and we could present evidence to rebut the finding that the competency decision was a competent decision. The State made quite a bit of—I see my time is out, so I'll have to stop there, Your Honor, unless the Court has further questions. No. If you had a final statement you wanted to make, go ahead. Thank you. Okay. I just want to point out the State talked extensively about trial counsel's strategy on different matters, and I just want to stress that there was no evidentiary hearing, and the State is drawing inferences without hearing from trial counsel, and we should be entitled to have a hearing where we can present testimony. Thank you. All right. Thank you, Counsel. The Court will take this matter under advisement. We are adjourned. Thank you.